592 So.2d 330 (1992)
Margaret BARBER, Appellant,
v.
STATE of Florida, Appellee.
No. 90-02278.
District Court of Appeal of Florida, Second District.
January 3, 1992.
*331 Stuart C. Markman and James H. Kynes of Kynes & Markman, P.A., Tampa, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee and Joseph R. Bryant, Asst. Atty. Gen., Tampa, for appellee.
RYDER, Judge.
Margaret Barber seeks review of the trial court's judgment entered on a jury verdict finding her guilty of child abuse by culpable negligence and of failing to report allegations of child abuse. We affirm in part and reverse in part.
Ms. Barber was convicted of one count of child abuse by culpable negligence and one count of failure to report child abuse. She received concurrent sentences of three years' probation and six months' probation respectively. Her motion for new trial or arrest of judgment was denied and this timely appeal followed.
At the time of the events involved in this case, Ms. Barber was a 62-year-old foster care counselor for HRS. One of the cases assigned to Ms. Barber involved a young child named Bradley McGee. Bradley McGee came into the social services system when he was abandoned by his mother, Sheryl Coe. Ms. Barber was assigned Bradley McGee's case as the primary foster care worker. When several months passed and she could not locate Bradley's mother, Ms. Barber recommended the transfer of Bradley's case to the HRS adoption unit. The adoption process was preempted, however, when Ms. Barber was contacted by Bradley's mother. Coe told Ms. Barber she wanted Bradley to be reunited with her and Thomas Coe, her husband and the child's stepfather.
Under the law, regulations, and HRS policy then in force, when Sheryl Coe contacted Ms. Barber and expressed the desire to regain custody of her son, Ms. Barber was required to make the reunification of the child with his natural parent her first priority. In accordance with this explicit legislative intent and the corresponding statutes and regulations, Ms. Barber was also required to develop for the Coes and implement with the court's approval a "performance agreement."
A performance agreement is a specific plan that states goals and tasks for reunifying a child with his parents. Under a performance agreement, the parents are directed to services and counseling and assisted in visitation with the child. Parents under a performance agreement seeking reunification with their child had the right under the law and under HRS policy to have visitation with the child. Ms. Barber prepared a performance agreement for reunifying Bradley with the Coes. The agreement was reviewed, approved and signed by Ms. Barber's supervisor. It was also approved by a judge of the juvenile court.
Under their initial performance agreement, the Coes were to work toward the accomplishment of a number of goals by performing various tasks, including attendance at parenting skills classes, maintenance of adequate housing, and maintenance of adequate income and employment. The Coes were to receive psychological evaluation and treatment. They were also to undergo screening or treatment for alcohol or drug abuse. Ms. Barber's role was to assist the Coes in completing their tasks, monitor their progress and report to the juvenile court. A visitation program for Bradley was also implemented through the performance agreement. During the first six months the plan was in effect, the Coes' visits with Bradley expanded from one hour of supervised sessions at the local *332 HRS office to unsupervised visits of three hours or more in the Coes' home.
Under the law, as a foster care worker, Ms. Barber did not have the power or authority to return Bradley or any other child in foster care to his parents. All of her actions were subject to the approval of her supervisor. The actual power to place or remove a child was reserved for the juvenile judge, who was required to conduct judicial reviews of foster care cases at regular intervals under procedures and criteria detailed by statute. See § 39.453, Fla. Stat. (1987).
Throughout this period, Ms. Barber regularly reviewed with her supervisor the Coes' progress under the performance agreement and the expanding visitation schedule. These areas were also addressed in the judicial review social study reports and accompanying cover letters that were signed by Ms. Barber and her supervisor. These reports were submitted to the juvenile judge in advance of each of the four separate judicial reviews that were conducted during the ten months the performance agreement was in effect.
On the third of the four judicial reviews, after the performance agreement had been in place and visitation had gradually expanded over a six-month period, the juvenile judge entered an order continuing Bradley in the legal custody and supervision of the HRS foster care unit, but gave the Coes custody of the child on an extended visit. This meant that Bradley would move to the Coes' home.
Ms. Barber and her supervisor submitted a judicial review social studies report and cover letter in advance of this third hearing in which they recommended the juvenile court take the action it took. At the same time, however, Ms. Barber also advised the juvenile court judge that Bradley was doing well in his foster home and was having difficulty separating from his foster mother. She further informed the judge that the Coes had failed to complete the alcohol and drug abuse program they had started. Ms. Barber and her supervisor recommended continued supervision, utilization of a placement support program worker to provide in-home parenting skills support and psychological counseling for the Coes. Ms. Barber's report to the judge also noted that a previously performed psychological evaluation of the Coes was "on file."
The foster mother, Pam Kirkland, with whom Bradley had been residing, strongly opposed the recommendation that the child be returned for extended visitation with his parents. Before the third judicial review, she voiced her concerns to Ms. Barber and to Ms. Barber's supervisor. Ms. Barber encouraged the foster mother to attend the judicial review and state her position in person to the juvenile judge. The foster mother did not attend the judicial review. She did, however, express her feelings and concerns in a letter she sent to the judge in advance of the third judicial review.
Later, during trial, Ms. Kirkland testified that Bradley was having great difficulty after the visitations with the Coes began. He would cry for no normal reason. He would be "panic-stricken" when Ms. Kirkland or her husband would leave the room, especially if the child was left by himself in the bathroom. Ms. Kirkland stated she had learned that Thomas Coe was unemployed and that the Coes had moved without authorization. Ms. Kirkland testified that Ms. Barber would not allow her to see Bradley again, even though Ms. Barber relied on Ms. Kirkland's observations in lieu of her own personal contact with the home.
Two months after the child had been returned to his parents' home, the juvenile judge conducted another judicial review. The judicial review social study report and cover letter submitted by Ms. Barber and her supervisor in advance of the hearing recommended the continuation of supervision and visitation on the existing terms. Certain problems and deficiencies were also noted, however. Ms. Barber reported to the juvenile judge that although the Coes had attended two scheduled psychological counseling sessions, they had missed one appointment and failed to cancel it. She also advised that there was additional stress on the family due to Sheryl Coe's pregnancy and that the Coes had missed *333 their last in-home appointment with their placement support program worker. Thereafter, the judge entered an order continuing supervision and visitation on the existing terms.
A few days after the fourth judicial review which continued supervision and visitation on the existing terms, Bradley was murdered by his stepfather. The cause of death was blunt trauma to the head caused by plunging Bradley repeatedly head first into the toilet. The state claimed at trial that Ms. Barber was responsible for this murder and therefore guilty of child abuse by culpable negligence primarily on the theory that by making two omissions from the reports she and her supervisor supplied the juvenile court, she had deprived the juvenile court of information that would have caused the judge to keep the child from the Coes' home.
The first omission on which the state's case was based was Ms. Barber's failure to tell the judge of the contents of the psychological evaluation that Ms. Barber had previously advised the juvenile judge was "on file." The evaluation had been prepared by an unlicensed psychologist, Lori Belge, at the direction of Wanda Kitchen, the HRS employee who had the Bradley McGee case before it was assigned to Ms. Barber. The evaluation was fifteen months old at the time of the third judicial review when the juvenile judge ordered Bradley returned to the Coes for extended visitation.
The state argued that Ms. Barber was culpably negligent in failing to advise the juvenile judge of the contents of the psychological evaluation of the Coes because the report contained specific information concerning the Coes' problems and recommended steps to remedy them. The psychological evaluation recommended that before returning the child to the Coes, the Coes should demonstrate residential, employment and marital stability. It also recommended that after the return of the child, unscheduled visitation and in-home child care instruction be implemented along with parenting classes and psychological therapy. The report also contained a statement that due to his immaturity, Thomas Coe could react to anger or stress with "a rather infantile explosiveness." There was also a comment in the evaluation describing Sheryl Coe as immature and subject to "affective explosions" when she did not receive "immediate gratification or approval."
The psychological evaluation concluded that, without providing supervision, instruction and demonstration for the Coes, children in the Coes' care were at risk of being "neglected or inadequately supervised." The report did not state, however, that such children were at any risk of physical abuse or violence, even if returned to the Coes without the implementation or completion of any of the recommended steps. The psychologist admitted that at no point did she conclude Bradley was "a high risk child" or that he should not be returned to his parents. The record, however, reveals that each and every one of the recommendations made in this evaluation was adopted as a goal in the Coes' performance agreement and specific tasks were established in the performance agreement to accomplish them.
Wanda Kitchen, the social worker who ordered the psychological evaluation before Ms. Barber became involved with Bradley's case, did not bring the report to the attention of the juvenile court. Although Ms. Barber, in her communications with the juvenile judge, did not discuss the contents of the psychological evaluation, it is undisputed in the record that on at least three different occasions and in three different reports submitted both before and after Bradley was returned to the Coes for extended visitation, Ms. Barber specifically told the juvenile judge the psychological evaluation was "on file." She also told the juvenile court before the child was returned that no counseling or therapy involving the Coes had taken place. There is no evidence in the record that on any of the occasions when the existence of the psychological evaluation was mentioned, the judge ever inquired about the report, requested to review it or indicated that it was not in the court file and had not been reviewed.
*334 The second omission on which the state relied was Ms. Barber's failure to report an accusation of an abusive toilet training session during which Sheryl Coe allegedly disciplined the child by putting feces at or in Bradley's mouth. On July 5, 1989, Ms. Barber received a call from Teresa Jacobs. Ms. Jacobs knew Bradley and the Coes since Bradley was four weeks old. She told Ms. Barber that she had recently seen Bradley. Ms. Jacobs informed Ms. Barber that she "saw a lot of things [she] didn't like." Ms. Jacobs testified that she told Ms. Barber that she thought Bradley's life was in danger but Ms. Barber, in her opinion, seemed unimpressed. Ms. Jacobs said she became stern and stated that Bradley had circles "down in his face" as if he was in distress, that his shoulders were slumped, that he was withdrawn and inactive, and that Bradley was made to eat his own feces and stand in a military stance.
The evidence at trial showed that this same child abuse incident had previously been reported in the HRS central abuse registry on July 3, 1989. This was prior to Ms. Jacobs' call to Ms. Barber on July 5, 1989. That child abuse report had already been investigated and no evidence was found to substantiate it. Because the incident had already been investigated and found unsubstantiated, Ms. Barber did not report the information received from Ms. Jacobs. However, the state argued that Ms. Barber's failure to report the incident was proof of both the child abuse charge and the charge of failing to report known or suspected child abuse. Ms. Barber testified that she declined to report this incident to the judge because it had been investigated and no evidence was found to support it.
During trial, both in opening and closing argument, the prosecutor explained to the jury that to establish that Ms. Barber was culpably negligent, the state needed only to prove that, in making omissions from the information supplied to the juvenile judge, Ms. Barber failed to act as a "reasonably prudent person." The prosecutor also stated that Ms. Barber was "charged with being unreasonable," and compared her actions to other persons whose actions were "reasonable." Ms. Barber's defense attorney did not object to any of the remarks made or make any motions for mistrial in response to them.
In order to convict Ms. Barber of the child abuse charged in Count I, the state had to prove that Ms. Barber caused Bradley's death by permitting the infliction of physical injury to the child through "culpable negligence." See § 827.04, Fla. Stat. (1987). Culpable negligence is defined as "reckless indifference or grossly careless disregard for the safety of others." McDaniel v. State, 566 So.2d 941 (Fla. 2d DCA 1990). In order to prove "culpable negligence," the state must show
a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.
Russ v. State, 140 Fla. 217, 191 So. 296, 298 (1939) (citations omitted). See also State v. Greene, 348 So.2d 3 (Fla. 1977).
The state has not proven, in this case, that Ms. Barber's actions or omissions demonstrated a complete disregard or reckless indifference to Bradley's life. Ms. Barber's actions or omissions were not equivalent to an intentional violation of Bradley McGee's rights. Ms. Barber did not fail to give the juvenile judge any relevant information. The judge had all of the facts before her and was told by Ms. Barber that the psychological evaluation was "on file," but the judge never inquired about it. Ms. Barber and her supervisor informed the judge that the Coes had failed to complete the alcohol and drug abuse program and had not yet begun psychological counseling. Ms. Barber kept the judge updated on the status of Thomas Coe's employment and the stability of the couple's residence. The information was well documented and well known by the judge. It appears that nothing was hidden by Ms. Barber. From this record, the actual status of the Coes' progress with the performance agreement was known by the juvenile judge for her consideration.
*335 The state takes issue with the fact that Ms. Barber informed the judge that the Coes had completed their parenting class, claiming that the Coes only attended one-half of the classes. The Coes, however, received a certificate of completion from the organization monitoring the course, and Ms. Barber had no input in that decision.
To support the charge of culpable negligence, the state argues that Ms. Barber neglected to provide the juvenile judge with relevant information that, if provided to the judge, would have caused the judge to keep Bradley from the Coe home. However, there was no showing at trial that, had the juvenile court been furnished the contents of the psychological evaluation or been made aware of the child abuse report, the judge would have changed any of her rulings or denied the Coes extended visitation with Bradley. Indeed, the trial judge conceded on the record but out of the hearing of the jury "that we won't ever know" whether the juvenile judge would have kept Bradley from the Coes had she been aware of the contents of the psychological evaluation. Because the evidence was insufficient to prove that Ms. Barber's actions amounted to a reckless disregard of human life, the conviction and sentence on Count I is reversed.
When Ms. Barber received the call from Ms. Jacobs, who related the child abuse (feces eating) incident, Ms. Barber should have reported the incident to the HRS central abuse registry. See §§ 415.504 and 415.513(1), Fla. Stat. (1987). Ms. Barber argues that section 415.513(1) is unconstitutional because it is overbroad. Section 415.513(1) reads in pertinent part as follows:
Any person required by s. 415.504 to report known or suspected child abuse or neglect who knowingly and willfully fails to do so, or who knowingly and willfully prevents another person from doing so, is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Section 415.513(1) is not unconstitutional because it is overbroad, as argued by Ms. Barber. Section 415.504 provides that any person, including foster care workers, "who knows, or has reasonable cause to suspect, that a child is an abused or neglected child shall report such knowledge or suspicion to" the HRS abuse registry. § 415.504(1)(e), (2)(a), Fla. Stat. (1987) (emphasis supplied). Even if an incident of child abuse is determined to have already been reported to the abuse registry, the statute requires the incident to be reported to the abuse registry again.
Ms. Barber contends that this requirement makes the statute overbroad. We do not agree. The reason for this requirement is that reports of the same incident of abuse from different sources tend to show the gravity of the situation. This also gives HRS workers the ability to contact more sources in order to investigate the incident and confirm or deny that it happened. Ms. Barber's failure, in this case, to report the child abuse incident to the HRS central abuse registry was a violation of section 415.504. Accordingly, Ms. Barber's conviction and sentence on this count is affirmed.
The facts here presented a very close case to the jury. The state even admitted during oral argument that this was a close case. The prosecutor's statements to the jury in both opening and closing argument, which gave the jury the impression that simple negligence was the state's burden of proof, were improper. Although no objections were made, we are unable to say, due to the closeness of this case, that even if Ms. Barber's omissions amounted to simple negligence, the statements did not prejudice the jury. The prosecutor's comments erroneously mislead the jury regarding the test for "culpable negligence."
Ms. Barber's conviction and sentence on Count I, for child abuse by culpable negligence, is reversed. The conviction and sentence on Count II, for failure to report an incident of child abuse, is affirmed.
Affirmed in part, reversed in part.
SCHEB, A.C.J. and LEHAN, J., concur.